**MONARCH ELECTRIC & WIRE CO. v. COMMISSIONER OF INTERNAL REVENUE.**
No. 4202.

Circuit Court of Appeals, Seventh Circuit.

Feb. 26, 1930.

Evans, Circuit Judge, dissenting.

Herbert G. Mayer and Carl Meyer, both of Chicago, Ill., for appellant.

Randolph C. Shaw, of Washington, D. C., for appellee.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

SPARKS, Circuit Judge.

This is a petition by Monarch Electric & Wire Company to review an order of the Board of Tax Appeals entered August 14, 1928, and involves income and excess profits taxes for the year 1920, in the amount of $6,104.03.

The uncontroverted facts relating to this issue are as follows:

In 1906, one Nathan Deutsch owned the entire capital stock of the Monarch Electric & Wire Company, an Illinois corporation organized in 1902 (not the petitioner herein). In the latter part of 1906, Deutsch sold a 16 per cent. interest in this company to each of the three Schwab brothers, L. S. Schwab, H. S. Schwab, and A. G. Schwab, and retained for himself the remaining 52 per cent. controlling interest. In the latter part of the year 1919, the Schwab brothers began negotiations for the purchase of Deutsch's stock. Both parties dealt at arm's length through their respective attorneys. An agreement, dated January 1, 1920, was finally perfected, by the terms of which the name of the company was changed to Schwab Electric Company; a new corporation, the petitioner herein, was organized and acquired all the assets subject to the liabilities of the Schwab Electric Company, with the exception of certain indebtedness of Deutsch which was canceled and $25,300 in Liberty Bonds which was paid directly to Deutsch. Besides the Liberty Bonds and the cancellation of his indebtedness, Deutsch received from petitioner $300,000 par value of its preferred stock (being

418

its total authorized preferred stock). This preferred stock had voting rights, and was entitled to cumulative dividends of 6 per cent. per annum, the payment of the dividends being guaranteed individually by the three Schwab brothers. The Schwab brothers further agreed that this preferred stock would be redeemed at a certain amount each year, the last maturity of which is to be April 1, 1937.

The Schwabs further agreed with Deutsch that until $100,000 of the preferred stock was redeemed their aggregate annual salaries would not exceed $36,000, and until $150,000 par value of preferred stock was redeemed their aggregate annual salaries would not exceed $45,000, and until $200,000 par value of preferred stock was redeemed their aggregate annual salaries would not exceed $54,000.

The three Schwabs received from petitioner all its common stock, which gave the Schwabs a 52 per cent. interest and voting control.

The assets conveyed to petitioner by the Schwab Electric Company had a fair market value, in the amount agreed upon between Deutsch and the Schwabs and admitted by respondent, and were reflected as invested capital in the petitioner's income tax returns as follows:

Leasehold .................... $ 75,000.00
Building ..................... 300,000.00
Machinery .................... 46,075.52
Good will .................... 75,000.00

These assets were taken over by the petitioner at the above figures. The Schwab Electric Company had carried the assets at a much lower valuation, and no good will was carried as an asset by it.

Respondent, in computing petitioner's invested capital, valued the assets acquired by petitioner from the Schwab Electric Company on the same basis as they stood on the books of that company, instead of at their market value. Petitioner contends that for the year 1920, it is entitled to have its invested capital computed on the actual cash value of the property paid in for its stock on January 1, 1920, and that the limitation of section 331 of the Revenue Act of 1918 is not applicable. The commissioner contends that the limitation of section 331 is applicable. This is the only issue involved.

The material portion of section 331 of the Revenue Act of 1918 (40 U. S. Stat. 1095) is as follows:

"Sec. 331. In the case of the reorganization, consolidation, or change of ownership of a trade or business, or change of ownership of property, after March 3, 1917, if an interest or control in such trade or business or property of 50 per centum or more remains in the same persons, or any of them, then no asset transferred or received from the previous owner shall, for the purpose of determining invested capital, be allowed a greater value than would have been allowed under this title in computing the invested capital of such previous owner if such asset had not been so transferred or received: * * * *"

■■ Petitioner contends that inasmuch as Nathan Deutsch, on January 1, 1920, owned more than 50 per cent. of the stock of the Schwab Electric Company, and after the reorganization or change of ownership he owned less than 50 per cent. in the new corporation, such transaction does not come within the provisions of the statute. With this contention we cannot agree. In our judgment the wording of the statute is not ambiguous in this particular. It explicitly says that "if an interest or control of 50 per centum *or more* remains in the same persons, *or any of them*," (italics ours), then the statute applies. Before the reincorporation Deutsch, it is true, owned and controlled more than 50 per cent. of the stock; but it is also true that he, with either one or more of the Schwabs, at that time owned and controlled more than 50 per cent. of the stock. After the reincorporation we find the persons holding the stock in the new corporation are identical with the stockholders in the old, and that Deutsch, with either one or more of the Schwabs, still owns and controls more than 50 per cent. of the stock of the new corporation; and this brings the transaction squarely within the statute.

We are thoroughly convinced that the reorganization and transfer of stock was a bona fide transaction in every particular, and that there was no effort whatever on the part of petitioner or its stockholders to circumvent the government; but of course these facts are not sufficient to overcome the plain and unambiguous terms of the statute.

The order of the Board of Tax Appeals is affirmed.

ALSCHULER, Circuit Judge.

I concur in this opinion.

Section 331 was drawn to meet "reorganization, consolidation, or change of ownership of a trade or business, or change of ownership of property, after March 3, 1917." The form of ownership is immaterial. It may be

individual, partnership, or corporate. To my mind the evident intent of the section is, that if, after any such change, any person or persons, singly or collectively, shall hold in the reorganized business as much as 50 per cent. of the entire interest or control therein, and are the same person or persons who, singly or collectively, held as much as 50 per cent. interest or control in the old business, the reorganized business shall not, for the purpose of determining invested capital, be allowed a greater value on any of its assets than would have been allowed, upon the same assets, to the old business had there been no reorganization.

Here not only 50 per cent., but the *entire* ownership—and so the entire control or interest in the consolidated business—is in the same persons, and in none others, as was the *entire* interest and control in the old business.

It follows that, for the purposes of the Revenue Act of 1918, section 331 precludes to the reorganized corporation a capitalization different from that which would have been permissible to the old corporation had this reorganization not taken place.

EVAN A. EVANS, Circuit Judge (dissenting).

The determinative words of the statute quoted in the majority opinion are: "if *an interest or control* in such trade or business or property of 50 per centum or more *remains* in the *same persons, or any of them,* then, etc."

The object of the legislation is obvious. Inasmuch as income tax rates were in part dependent upon the ratio of earnings to invested capital, the incentive to reorganize, that a larger capital investment might be secured, was great. To make its revenue more certain and to prevent abuse through fictitious reorganizations of large corporations, this section 331 of the Revenue Act of 1918 was enacted. Generally speaking, the statute permitted an increase in invested capital only where the bona fide transfer left less than 50 per cent. of "the trade or business or property" in the possession of the seller. In the present case, less than 50 per cent. remained in the vendor who previously held more than 50 per cent. of the stock of the company. But the majority holder here transferred his stock to minority stockholders. Had the transferees been strangers to the company's ownership, there would have been no doubt about the non-applicability of the statute. The precise question then is: Must the sale of "an interest or control" be

to outsiders or does the statute embrace bona fide transactions whereby such interest is transferred from the holder or holders of the control to minority interests in the same corporation.

It seems to me that the purpose of the legislation was not to exclude an interpretation which included the larger group. True, the Congress used the words "same persons or any of them" and the word "persons" is plural and may include holders of minority as well as majority stock. But in construing "persons" it is important to look to the verb, which is "remain." When the Congress spoke of the interest or control in whom 50 per cent. or more *remained*, it was defining "same persons" and hooking up the control or an interest with the expression "same persons." The verb, to a certain extent, defines "interest or control" and "in the same persons or any of them." At least it excludes the thought that the interest or control referred to is any other than "the persons" who held before and after the sale 50 per cent. of the stock.

To illustrate, A owns 52 per cent. of the stock, and X, Y, and Z own together 48 per cent. of the stock. Who owns control? Obviously, A. It is not A *and* X, Y, and Z.

Again the persuasive word is *"remain."* If A, who had control, sells out and, after the sale, 50 per cent. or more of the stock does not remain in him, then such a change in interest or control has occurred which will permit of a restatement of invested capital.

If a different construction be given to the statute, absurd results would follow. To illustrate, in a corporation of many stockholders, A holds 75 per cent. of the stock. B, C, and D, increase their holdings from 1 per cent. to 52 per cent. Upon respondent's theory, the statute applies. If A sold to X, Y, Z, heretofore non-stockholders, then a restatement of invested capital could be made.

The figure "50 per cent." is likewise significant. Why was this percentage chosen? The answer lies in the fact that more than 50 per cent. indicates control. Just even 50 per cent. indicates control has not been divested.

By stressing both the words "50 per cent." and the word "remain" the construction of the words "an interest or control" is simplified. Concerning the meaning of these words no doubt exists as to the meaning of the word "control." But respondent construes the words "an interest" to mean any interest, large or small, and not limited to a single stockholder or group of stockholders who together own the control. A better construc-

tion would be given, it seems to me, if one approached the words "an interest" in the light of the verb and the percentage. How could "an interest" be one that did not represent the majority stockholders in view of the reference to 50 per cent. thereof remaining after the sale.

Under respondent's construction, if fifteen small and unassociated stockholders hold more than 50 per cent. of the stock and sell their holdings to one or more outsiders, the statute does not apply and a restatement of capital invested may be made. My conclusion is that a restatement of the invested capital should not turn solely upon the introduction of outside stockholders, but rather depends upon the existence of an interest which had control and which sold that interest or at least did not retain 50 per cent. of the stock.